## HARRIET SAWYER *v.* LEANDER SAWYER.

Practice in chancery in regard to the impeachment of witnesses the same as at law.

Before the credit of a witness can be impeached by proof of inconsistency in his declarations, a foundation must be laid by questioning him on cross examination as to his former statements, that he may have an opportunity for explanation.

Having laid this foundation, a party may proceed without exhibiting articles of impeachment.

Each party must pay for taking down the cross examination of his adversary's witness, as well as the direct examination of his own.

A witness having been examined, after his examination is closed cannot be examined as to the same facts without an order of the Court; but he may be as to other facts, or new matter arising out of the testimony of other witnesses.

Divorce will not be granted upon the admissions of a party unsupported by evidence, but the amount of evidence required varies with the danger of collusion.

THIS was a petition for a divorce from the bonds of matrimony, on account of extreme cruelty.

*Miles & Wilson*, for petitioner.

*Mundy & Fletcher*, for defendant.

THE CHANCELLOR. There are several questions of practice which it is necessary to decide, before proceeding to the merits of the case.

1. Some of the defendant's witnesses, on their cross-examination, were questioned as to statements previously made by them at variance, or inconsistent with what they had sworn to on their direct examination, for the purpose of impeaching them.

2. Witnesses were examined by the petitioner to im-

peach the defendant's witnesses, without filing articles, and obtaining an order of the Court for that purpose.

3. Witnesses who had been examined by the petitioner, were afterwards re-examined to impeach the defendant's witnesses, without any order of the Court for their re-examination.

These several objections were taken before the Master, and renewed at the hearing by the defendants' counsel.

The practice in this Court in the examination of witnesses, differs essentially from the practice of the Court of Chancery in England. By the English practice the examination is in secret, neither the parties nor their counsel being permitted to be present; and the examination is on written interrogatories. With us, the examination is in the presence of the parties, and their counsel, and such other persons as choose to attend; and the witnesses are examined and cross-examined by the counsel of the respective parties, as in a trial at law, in the presence of the Master who takes down their testimony. The benefits of this mode of examination, more than counterbalance its evils. It is better calculated to elicit truth than a secret examination on interrogatories drawn, as they frequently must be, without a full knowledge of what the witness knows; and it secures more fully the benefits of a cross-examination, which must ever be defective when on interrogatories drawn up without a knowledge of what the witness has sworn to upon his direct examination. Nor can written interrogatories be as effectual in extracting the truth from an unwilling witness as a *viva voce* examination, where the questions may be so varied, and with such nice shades of difference as to deprive the witness of every possible loophole to evade telling the truth, without committing perjury, and subjecting himself to a criminal prosecution. These are some of the advantages attending

our practice, whatever may be its defects; but its benefits would, to some extent, be lost, if a witness could not be asked on his cross-examination, whether he had not represented differently, at other times, the facts to which he had sworn upon his direct examination. This is everyday's practice at law. The credit of a witness at law cannot be impeached by proof that he has said or declared any thing inconsistent with the evidence he has given, unless a foundation for the introduction of such evidence is first laid, by asking him upon his cross-examination whether he has not made such statement or declaration, that he may have an opportunity to explain his conduct. *The Queen's Case*, 2 *Brod. & Bing.* 310. *(S. C.* 6 *Eng. Com. Law R.* 112.) (1)

A different rule in this Court would have one of two effects; it would either take from a party his right to impeach a witness in this way, or from the witness his right to admit under oath the declarations or statements he had made, and to state his reasons for making them, thereby rendering it unnecessary in all cases to examine other witnesses to prove the fact. Under our practice the rule at law on this subject should be the rule of this Court.

The petitioner, having laid a foundation for impeaching the defendant's witnesses, was at liberty to do so without exhibiting articles for that purpose. The English practice has never been adopted by this Court. An instance is not known, in which articles to impeach the credit of a witness have been exhibited. The reason does not exist under our practice, that obtains under the practice of the English Court of Chancery, where a party, from the secret manner in which the evidence is taken, cannot know till publication what his adversary's witnesses have sworn to, and it is then too late for him to take further proofs in the cause without leave of the Court. Some evils, it is

true, may grow out of this practice. It may open too wide a door for cumbering a cause with voluminous testimony, much of which may not be worth the taking, and in that way retard the despatch of business by the Court. The expense of taking testimony will, however, to some extent, check this evil. Each party must pay for taking down the cross-examination of his adversary's witnesses, as well as the direct examination of his own; and a protracted direct or cross-examination on immaterial facts, by either party, would only increase his expenses, without occasioning a corresponding benefit to himself or injury to his opponent.

After a witness has been once examined and his examination has been closed, he cannot be re-examined to the same facts, unless by order of the Court; but he may be re-examined as to facts to which he has not been examined, or to new matter arising out of the testimony of other witnesses. 1 *Hoff. Ch. Prac.* 464; *Swinford* v. *Horne,* 5 *Madd. R.* 379.

Having disposed of these preliminary questions, I proceed to the merits of the case. Two objections were made by the defendant's Counsel to granting the prayer of the petitioner; *first,* to the character of the evidence, which, it was said, consisted entirely of the admissions or confessions of the defendant, and that the Court should not grant a divorce on such testimony, unsupported by other evidence; *secondly,* that the petitioner was as much to blame as the defendant, and was therefore entitled to no relief, the statute providing that no divorce shall be granted where the party complaining is guilty of the crime set forth in his or her petition.

In *Baxter* v. *Baxter,* 1 *Mass. R.* 345, it was held that the confessions of the party, uncorroborated by other circumstances, were inadmissible to prove the fact of adul-

tery.   In *Holland* v. *Holland*, 2 *Mass. R.* 154, which was
also a case of divorce for adultery, the Court say: "The
rule is established by uniform practice that the confession
of the party, unsupported by other evidence, is not suffi-
cient to ground a divorce upon."   In *Betts* v. *Betts*, 1 *J. C.
R.* 197, which was a bill for a divorce, charging the de-
fendant with adultery and cruel treatment, the Chancellor
said, it "is well settled, that the confessions of the party
are admissible on a charge of adultery, *if supported by
other proof;* but unless corroborated by other evidence and
circumstances, they are not sufficient ground for a decree."
In cases of adultery, the right to a divorce consists in the
proof of a single fact, and if the confessions of the party
were to be received as sufficient proof, there would be
danger of collusion.   It is to guard against this, that other
proof is required in corroboration of the defendant's con-
fessions.   The same rule must apply to confessions as evi-
dence in all other cases of divorce from the bonds of mat-
rimony, with this limitation, that, where there is less dan-
ger.of collusion, or it could not be practiced so easily, the
corroborating facts or circumstances need not be of so de-
cisive a character.   The object of the rule is to guard
against collusion, not to obstruct the administration of jus-
tice.   Where the circumstances of the case are such as to
repel all suspicion of collusion, and leave in the mind of
the Court no doubt of the truth of the confessions, it should
act accordingly.   The evidence in the present case is vo-
luminous, and somewhat contradictory.   But, if the de-
fendant's admissions, made at different times and to diffe-
rent individuals, under circumstances that repel every
thing like collusion, are worthy of credit,—and it seems
to me there can be no doubt on the question,—his cruel
treatment of the petitioner is fully made out.   His admis-
sions of personal violence to her, both before and after

Sawyer *v.* Sawyer.

she had left him the first time on account of his ill treatment, are clearly proved; and corroborated in one instance by marks of violence seen upon her face, to which several witnesses have testified. This was before she left him the first time; and, when she left him the last time, it was on account of personal violence. His confession of this fact, as well as of abusing her, and using indecent and cruel language to her, is proved by several witnesses. Mr. Lerned in his testimony says, that he admitted he kicked her on the morning she left his house, and that he turned her out of doors.

The defendant has failed to show that she was guilty of like cruel treatment of him. The evidence of the only witness examined for that purpose, is too inconsistent with the previous statements made by the same witness to third persons, to entitle it to much credit, supposing it in other respects to be sufficient to make out a defence under the statute, which I think is not the case.

The Court will reserve the question whether the decree to be entered in this cause shall be for a divorce from the *bonds of matrimony,* or from *bed and board* only, until the next term of the Court. This is done, as there is doubt whether the Court can grant alimony, in case a decree should be entered dissolving the bonds of matrimony, (2) and that the parties may have an opportunity to adjust their difficulties between themselves before that time, should they be disposed to do so.

(1) See also further, 1 *Stark. Ev.* 183; *Angus* v. *Smith,* 1 *Mood. & Malk.* 473; (*S. C. Eng. Com. Law. R.* 360.)

(2) The law is now amended so that alimony may be granted "upon divorce for adultery, committed by the husband, or on account of his being sentenced to confinement to hard labor, or for any other cause." *Laws* 1843, *p.* 7.